IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JEFFREY W. BLOUNT,**  Case Number 5:13CV1709

    Plaintiff,  Judge Patricia A. Gaughan

    v.  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.  REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Jeffrey W. Blount seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI") benefits. The district court has jurisdiction under 42 U.S.C. § 405(g). This matter was initially referred to Magistrate Judge Kenneth S. McHargh pursuant to Local Rule 72.2(b)(1) (non-document entry dated August 7, 2013) and subsequently transferred to the undersigned for a Report and Recommendation pursuant to 18 U.S.C. § 137 (Doc. 21). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits on April 8, 2010, alleging disability since January 15, 1998, due to arm injuries and a staph infection in his back. (Tr. 12, 84, 103). At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ"). (Tr. 26, 67). Plaintiff, unrepresented by counsel, and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 12, 26). The Appeals Council denied Plaintiff's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On August 7, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Born August 11, 1957, Plaintiff was 54 years old on the date of the ALJ's decision. (Tr. 84). He has a high school education and prior relevant work experience as a sales clerk at a clothing store. (Tr. 20, 104). Previously, Plaintiff served two years in the Army. (Tr. 38).

Plaintiff lived with this long-time girlfriend in a two-story house. (Tr. 37, 335). Concerning daily activities, Plaintiff drove, watched television, helped with laundry, went grocery shopping, and bathed with limited frequency due to trouble getting in and out of the tub. (Tr. 37, 49-50). He rarely left the house and his girlfriend did the cleaning and cooking. (Tr. 37, 49-51).

Plaintiff claimed constant pain and weakness in his lower back and arms precluded his ability to work. (Tr. 39-40, 113-14). He also complained of weight loss, saying he lost thirty or forty pounds in a nursing home because he did not like the food. (Tr. 37).

*Medical Evidence*

On September 9, 1999, Plaintiff went to the emergency room with complaints of right wrist pain. (Tr. 290). The treatment provider noted Plaintiff had a history of problems with his right wrist, including surgery to remove bone fragments, which were the result of a previous trauma that did not properly heal. (Tr. 290). An x-ray revealed marked degenerative changes without evidence of acute bony injury, periosteal elevation, or other acute findings. (Tr. 290, 292). The treatment provider concluded that the significant inflammation and swelling may be secondary to minor trauma of uncertain etiology, but noted predisposing factors including

surgery and obvious degeneration. (Tr. 290). The doctor was minimally concerned about septic arthritis because Plaintiff's discomfort was not severe and he had an active range of motion. (Tr. 291). At discharge, Plaintiff received anti-inflammatory medication and a Velcro wrist splint. (Tr. 291).

Plaintiff fell off a ladder at work in March of 2001, lacerating the left side of his face and elbow. (Tr. 275, 278). Examination of the elbow revealed a superficial laceration but the elbow itself was nontender, there was no focal bony tenderness, and he had excellent range of motion. (Tr. 278). A CT scan of Plaintiff's head was unremarkable. (Tr. 284). Plaintiff's wounds were treated and he was released. (Tr. 275, 278-80).

Plaintiff treated with Paul Coleman, M.D., since at least May 1, 1997, typically for chronic pain stemming from work-related injuries to his arms and back. (Tr. 167-243). Dr. Coleman routinely prescribed pain medication, including Vicodin. (Tr. 167-236, 250-56, 261).

On October 15, 2005, Plaintiff was admitted to the hospital complaining of acute left upper quadrant abdominal pain with radiation to the shoulder and chest pain. (Tr. 264-65, 293-300). He also developed profound anemia with evidence of splenic hematoma. (Tr. 264, 266, 273, 306-07). Echocardiograms ("ECGs") and a chest CT scan were unremarkable. (Tr. 267-72, 274, 293-300). At the time, Plaintiff worked as a roofer with "excessive physical exertion". (Tr. 264). After receiving non-steroid anti-inflammatory medication and a platelet transfusion, he signed himself out of the hospital early against medical advice. (Tr. 265, 309).

Plaintiff followed up with Dr. Coleman several times in mid-October and early November of 2005, to address an ulcer and splenic bleeding. (Tr. 182, 185, 301, 304). Plaintiff asked Dr. Coleman whether he would be able to return to work in twelve months, and Dr. Coleman responded he would be able to work within a few weeks. (Tr. 182). Plaintiff also

complained of left rib pain, and Dr. Coleman advised him to stop smoking and suspected pleurisy with infection. (Tr. 185).

On December 31, 2009, Plaintiff was admitted to the hospital with fever, weakness, low back pain, high white count due to sepsis with MSSA staphylococcus aureus, and acute renal failure due to sepsis. (Tr. 143). Plaintiff wandered the hospital "yelling obscenities and expressing frustration." (Tr. 146). He was physically removed from the hospital but returned the next day with ongoing back pain. (Tr. 146).

Upon return to the hospital, Plaintiff underwent a series of tests. An x-ray of Plaintiff's chest revealed bilateral hyperaeration with no obvious acute process. (Tr. 148, 310). CT scans of the abdomen and pelvis revealed abnormal soft tissue and possible gas densities surrounding the margin of L5, abnormal bone appearance with possible paraspinal abscess formation or discitis/osteomyelitis not excluding developing epidural abscess, possible right lower lobe pneumonia, cholithiasis, and small hypodensities of the liver which were too small to characterize. (Tr. 149-50). An MRI of Plaintiff's lumbar spine indicated extensive spinal and paraspinal infection extended between L4 through the S2 levels, including a large paravertebral soft tissue abscess, possible extension into the left psoas muscle, large epidural abscess, and likely osteomyelitis and discitis involving L4-L5. (Tr. 151-52). An x-ray of Plaintiff's lumbar spine revealed instruments at the posterior aspect of the spine at the L5-S1 level. (Tr. 153). An ultrasound retroperitoneum revealed no hydronephrosis. (Tr. 154). An x-ray of Plaintiff's right elbow revealed no fracture, moderate soft tissue swelling and mild joint effusion but did not exclude an underlying infection. (Tr. 155, 321). An x-ray of Plaintiff's chest revealed post PICC line placement and early atelectatic/infiltrative process to the right midlung. (Tr. 156, 333). An ECG was unremarkable aside from trace component of tricuspid regurgitation. (Tr. 157-58, 317-

4

18). There was no evidence of deep venous thrombosis. (Tr. 159-60, 319). A renal ultrasound revealed no hydronephrosis. (Tr. 320).

Due to persistent infection and paraspinal abscess, Plaintiff successfully underwent a lumbar epidural abscess on January 3, 2010. (Tr. 141-43, 312-15). On January 13, 2010, Plaintiff was sent to a nursing home where he stayed for six weeks while he received an IV of antibiotics. (Tr. 143, 334).

On October 29, 2010, Dr. Coleman completed a treating physician report where he diagnosed Plaintiff with chronic pain and weakness in his left upper arm from a nerve injury and severe right low back pain from back surgery. (Tr. 370). Dr. Coleman opined Plaintiff was unable to work because of his chronic low back pain and left upper arm pain. (Tr. 371).

Plaintiff received home health therapy in March of 2010. (Tr. 335-41, 345, 349-51). On March 4, 2010, K. Nagy, P.T., completed a physical therapy evaluation where he or she noted Plaintiff's principal reason for physical therapy was difficulty with his gait. (Tr. 259). Therapist Nagy found Plaintiff could independently maintain personal care and use the telephone but required assistance bathing and was dependent on others for meal preparation, transportation, laundry, housekeeping, and shopping. (Tr. 259). Plaintiff's muscle strength was generally 4/5 and he could sit, stand, and walk with support or a wheeled walker. (Tr. 259). Therapist Nagy's orders included posture training exercises, lower body muscle strengthening exercises, balance exercises, gait training, transfer techniques, endurance improvement, strength exercises, and step training, but did not include upper extremity or upper body exercises. (Tr. 260).

On August 3, 2010, Plaintiff underwent a consultative examination with Chimezie Amanambu, M.D., which revealed a grossly normal physical examination except for right elbow olecranon bursa swelling. (Tr. 352-55, 357-58). Plaintiff told Dr. Amanambu he had back, hip,

5

and thigh pain and thought he could walk for one mile without assistance and stand or sit for thirty minutes. (Tr. 356). No arm pain was reported. (Tr. 356). Dr. Amanambu concluded Plaintiff could sit, stand, kneel, bend, twist, crawl, lift, carry, and reach but may experience difficulty with prolonged activities. (Tr. 358). He added Plaintiff's speech and hearing were not affected and he could perform a range of light work. (Tr. 358).

On August 25, 2010, state agency physician W. Jerry McCloud, M.D., reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (Tr. 359). Dr. McCloud concluded Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and had an unlimited ability to push and/or pull. (Tr. 360). Plaintiff had no manipulative, visual, communicative, or environmental limitations and few postural limitations, such that he could only occasionally stoop, crouch, or climb ladders, ropes, or scaffolds. (Tr. 361-64). Gary Hinzman, M.D., affirmed Dr. McCloud's findings as written on November 10, 2010. (Tr. 367).

Dr. Coleman provided a second medical source statement on June 20, 2012, where he opined Plaintiff could lift or carry up to ten pounds occasionally and five pounds frequently due to arthritis in his left arm, neck, and lumbar spine. (Tr. 374). Plaintiff could stand or walk for one-third of an eight-hour workday in total and one-fourth of an eight-hour workday without interruption. (Tr. 374). Dr. Coleman further concluded Plaintiff could sit for one-half of an eight-hour workday in total and one-quarter of the day without interruption. (Tr. 374). According to Dr. Coleman, Plaintiff could never climb and could occasionally balance, stoop, crouch, kneel, and crawl. (Tr. 375). Dr. Coleman added arthritis in Plaintiff's lower back affected his ability to reach, handle, feel, push, and pull. (Tr. 375). Plaintiff was to avoid exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, humidity, and vibration. (Tr. 375). Dr.

Coleman expected Plaintiff to be off task for 25% or more of a typical work day and to miss more than four days per month due to his impairments. (Tr. 375).

*ALJ Decision*

On April 11, 2012, the ALJ determined Plaintiff suffered from the following severe impairments: staphylococcus aureus sepsis, osteomyelitis of spinal vertebrae, osteoarthritis, and bursitis of the right elbow. (Tr. 12, 17). The ALJ found these impairments did not meet or medically equal a listed impairment. (Tr. 17). Next, the ALJ determined Plaintiff had the RFC to perform a range of light work, except he could not climb ladders, ropes, or scaffolds and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 18). The ALJ concluded Plaintiff was capable of performing past relevant work as a sales clerk under Dictionary of Occupational Titles ("DOT") number 211.462-013 and was therefore, not disabled. (Tr. 20-21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

7

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ: 1) did not articulate a valid basis for giving a treating source opinion less weight than the opinions of consultative and non-treating sources; 2) failed to insure Plaintiff had a full and fair hearing; and 3) did not meet his burden at step five of the sequential evaluation. (Doc. 17, at 7-14). Each argument is addressed in turn.

*Treating Physician Rule*

First, Plaintiff argues the ALJ erred in assigning weight to the opinion evidence of record. (Doc. 17).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent

9

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Here, the ALJ afforded no weight to Dr. Coleman's restrictive opinion because it was inconsistent with his treatment notes and Plaintiff's consultative examinations. (Tr. 20). Plaintiff argues the ALJ improperly classified Dr. Coleman's treatment of Plaintiff as medical/pain management. (Doc. 17, at 8-9). Plaintiff also claims the ALJ improperly acted as a "medical expert" by finding Dr. Coleman's treatment notes were inconsistent with his restrictive opinion. (Doc. 17, at 9).

Plaintiff's argument, suggesting that the ALJ improperly considered the consistency of Dr. Coleman's opinion with Dr. Coleman's own treatment notes, is without merit. Indeed, under 20 C.F.R. § 416.927(c), consistency of the opinion with the record as a whole is clearly within the ALJ's purview when evaluating a treating physician's opinion.

Moreover, as set forth by the ALJ, there is substantial evidence in the record to support the ALJ's treatment of Dr. Coleman's opinion. (Tr. 19-20). Even though Plaintiff treated with Dr. Coleman since at least 1997, there is very limited evidence of functional limitations to

10

support Dr. Coleman's restrictions. (Tr. 167-243). Rather, Dr. Coleman routinely managed Plaintiff's medication to address pain stemming from work-related injuries. (Tr. 167-243). In his brief, Plaintiff seems to acknowledge as much when he avers Dr. Coleman's records "do not go back to the original injury and so all that is noted is ongoing pain management through pain medications." (Doc. 8, at 15). Further, in 2005, after Plaintiff was hurt while working as a roofer, Dr. Coleman advised Plaintiff could return to work within a few weeks. (Tr. 182, 264). Also in 2005, Dr. Coleman reviewed Plaintiff's x-rays and observed plates and screws from an old injury and noted only mild weakness in the left hand. (Tr. 176). At the hospital, Plaintiff's wrist and elbow had full ranges of motion. (Tr. 278, 291).

The ALJ also found the fact that Plaintiff was working as a roofer in 2005 suggested he was less limited than Dr. Coleman's opinion suggested. Objecting to the use of this information, Plaintiff notes SSI is payable from the date of application (which was in 2010), and asks "[w]hy then is sporadic work done some five and ten years earlier, an indication of anything that is relevant to the decision of disability from 2010 going forward?" (Doc. 17, at 10). Plainly, the work is relevant because it occurred after Plaintiff's alleged onset date of disability, January 15, 1998, and before he applied for benefits. (Tr. 12, 84, 103); 20 C.F.R. 416.912(d) ("we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary".). Accordingly, the ALJ's finding that treatment notes are not consistent with Dr. Coleman's restrictive opinion is supported by substantial evidence.

In his reply brief, Plaintiff argues the ALJ should have found upper extremity restrictions in his RFC. (Doc. 20, at 2-3). However, Dr. Coleman was the only doctor to find upper extremity limitations, and his opinion was properly afforded no weight, as discussed above. Moreover,

despite alleging pain in his arms and wrists, Plaintiff declined having significant arm or manipulative limitations, saying that he had full range of motion in his arms. (Tr. 42-48). Further, according to Plaintiff, he was limited only in that he could not lift twenty pounds "very often" and had "clumsy" manipulative skills. (Tr. 42-48). Plaintiff's testimony, combined with the record evidence, supports the ALJ's finding that Plaintiff did not have significant arm or wrist restrictions. Therefore, the ALJ's RFC decision is supported by substantial evidence.

Next, Plaintiff argues the ALJ erred by affording the opinions of state agency physicians Drs. Amanambu, McCloud, and Hinzman more weight than the opinion of treating physician Dr. Coleman. (Doc. 17, at 8-10). However, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp.2d at 823-24.

Here, after affording no weight to the treating physician's opinion, the ALJ afforded significant weight to the state agency doctors' opinions because the opinions were generally consistent with the record as a whole and Plaintiff's conservative treatment regimen. (Tr. 20). In short, the ALJ properly considered regulatory factors including supportability and consistency as good reasons to afford the state agency doctors' opinions significant weight. *Douglas*, 832 F.Supp.2d at 823-24; *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir.

12

2011) (noting the "good reasons" rule does not require an "exhaustive factor-by-factor analysis"). Accordingly, Plaintiff's argument is not well-taken.

*Full and Fair Hearing*

Next, Plaintiff raises several arguments related to the ALJ's duty to fully develop the record. (Doc. 17, at 11-12).

An ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983). The Sixth Circuit has emphasized that this duty is particularly important when a claimant is acting *pro se*. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

Specifically, Plaintiff argues the ALJ failed in his duty to develop the record because he did not ask for additional records, did not ask how the epidural abscess arose or how it affected Plaintiff's pain, did not address the fact that Plaintiff never reviewed the record, mischaracterized Plaintiff's past relevant work, and did not follow-up with the VE. (Doc. 17, at 11-12). Common among each argument is Plaintiff's claim that he was prejudiced by lack of counsel. (Docs. 17, at 10-12; 20, at 3). For the following reasons, each of Plaintiff's arguments fails.

At the start of the hearing, the ALJ thoroughly walked Plaintiff through the hearing process and confirmed Plaintiff received notice months earlier that he was entitled to counsel.

(Tr. 29). The ALJ asked if Plaintiff changed his mind, saying counsel would be able to present evidence most favorably to his case. (Tr. 29-30, 32-36). The ALJ offered to delay the hearing so Plaintiff could obtain counsel and directed Plaintiff to resources to help find counsel. (Tr. 30). However, Plaintiff declined to seek representation. (Tr. 30). Further, it is worth noting that Plaintiff admits "the ALJ was very careful to explain the ramifications of going forward without an attorney, and asked many questions." (Doc. 17, at 11). For these reasons, Plaintiff's argument that he was prejudiced by lack of counsel is without merit.

Similarly, Plaintiff's argument about addressing the VE is misplaced because Plaintiff declined the ALJ's opportunity to do so. (Tr. 54-55); *see, e.g., Chandler v. Comm'r of Soc. Sec.*, 124 F. App'x 355, 359 (6th Cir. 2005) (no due process violation where the ALJ gave the plaintiff the opportunity to cross-examine the expert). Moreover, the ALJ was under no duty to continue to question the VE after his hypotheticals were answered.

Plaintiff's arguments as to whether the ALJ erred by failing to ask for more records, give Plaintiff a chance to review the records, or ask about his epidural abscess, are belied by the transcript. Indeed, the ALJ asked Plaintiff whether he had additional records he would like to submit, whether he had a chance to review the records, and whether he had any objections to the evidence which would be admitted. (Tr. 31). Plaintiff answered each question in the negative. (Tr. 31). Moreover, the ALJ offered Plaintiff time to review the record, but Plaintiff turned down the offer, saying he thought that was the ALJ's job and he would not understand the record anyway. (Tr. 31). Without objection, the ALJ admitted a substantial amount of evidence, as detailed above in the factual history, including a consultative examination and two state agency review opinions. (Tr. 352, 359, 367). To date, Plaintiff, who is now represented by counsel, has not submitted additional records.

14

Furthermore, at the hearing, the ALJ specifically asked about Plaintiff's back, wrist, and arm pain; kidney disease; osteoporosis; staphocacus aureos sepsis; osteomyelitis; bursitis; weight loss; and pneumonia. (Tr. 37, 40-49). In short, the transcript discredits Plaintiff's arguments that the ALJ failed to fully discuss Plaintiff's pain.

Last, Plaintiff argues the VE "mischaracterized" Plaintiff's past relevant work, claiming the VE directed the ALJ to the position of cashier rather than sales clerk. (Doc. 17, at 11-12). The Commissioner contends Plaintiff argues the "wrong vocational title" and did not establish error because Plaintiff's job duties are consistent with DOT 211.462-014. (Doc. 19, at 13).

At the hearing, Plaintiff described his past work as a sales associate. (Tr. 39). He said he put clothes away, was on the sales floor, restocked clothing, was on his feet most of the day, and lifted 20-25 pounds. (Tr. 39). The VE classified his previous work as a "salesperson in a department store" or "sales clerk" under DOT 211.462-014. (Tr. 53). Next, the ALJ described to the VE a person with a high school education and the above-described work history who could perform only a range of light work. (Tr. 54). In response, the VE determined Plaintiff could perform his past relevant work as a "sales clerk". (Tr. 54). The ALJ went on to adopt this finding, noting Plaintiff's RFC allows him to perform work as a sales clerk under DOT 211.462-014 "as generally performed." (Tr. 21).

Plaintiff's argument arises from the fact that the ALJ, VE, and Commissioner all cite to DOT 211.462-014, but refer to the position as "sales clerk" or "sales person" rather than its general title of "Cashier-Checker (retail trade)". (Tr. 20, 53; Doc. 19, at 13); DOT 211.462-014, *available at* http://www.oalj.dol.gov/libdot.htm (last visited July 24, 2014).

However, Plaintiff has failed to identify an actual conflict between the VE's testimony and the DOT. Indeed, "the DOT's job classifications are collective descriptions of 'occupations'

15

that can encompass numerous jobs." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601 (6th Cir. 2009). The fact "that a VE and the DOT might use different terminology to describe employment positions does not establish that a conflict exists between these sources of evidence." *Id*. As in *Lindsley*, Plaintiff here "has pointed to no legal authority or fact in the administrative record indicating otherwise." *Id*.

Indeed, a retail cashier-checker (DOT 211.462-014) requires reviewing price sheets, maintaining records, collecting cash, stocking shelves, counting money, weighing items, cashing checks, bagging items, or redeeming coupons. *Id*. Contrary to Plaintiff's claims that these tasks are inconsistent with his testimony, Plaintiff testified that he speaks English, has a high school education, and as part of his previous job, put clothes away on the sales floor and stocked shelves. (Tr. 38). Because there is not a notable conflict between the VE's testimony, the DOT, or Plaintiff's description of his capabilities and work history, Plaintiff's argument is without merit.

Alternatively, Plaintiff claims he is disabled because his past relevant work is now outside the relevant time period for SSI disability. (Doc. 20, at 3). However, Plaintiff waives any new argument first raised in a reply brief. *Bender v. Comm'r of Soc. Sec.*, 2012 WL 3913094, at *8 (N.D. Ohio) (collecting cases from the Northern District of Ohio applying this doctrine in social security cases) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). Upon review, Plaintiff's argument, regarding the time elapsed since he worked as a sales clerk, was first raised in his reply brief and is not substantially the same as the arguments raised in his merits brief so as to fairly appraise the Commissioner of Plaintiff's position in the case. *Bender*, 2012 WL 3913094, at *8. Accordingly, this argument is deemed waived.

In sum, the Court finds no conflict in the VE's testimony that Plaintiff would be mentally and physically capable of performing the "general" duties of a retail cashier under DOT 211.462-014. Further, the ALJ did not "mischaracterize" Plaintiff's work history. Last, the ALJ was careful and thorough in developing the record and conducting the hearing. For these reasons, Plaintiff's arguments regarding the fullness and fairness of the hearing are not well-taken.

*Step Five*

For his final argument, Plaintiff claims the ALJ did not support his step five determination with substantial evidence. (Doc. 17, at 12-14). However, the ALJ never reached step five of sequential evaluation. Rather, the ALJ concluded his disability determination at step four, where he assessed Plaintiff's RFC and determined whether he was capable of past relevant work. 20 C.F.R. § 416.920(4)(iv). If the ALJ determines Plaintiff was not disabled at step four, it is not necessary for him to move on to step five. § 416.920(4). Therefore, Plaintiff's step five argument is misplaced.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).